```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
JOHN SEASE,
 [name changed in 2008 to                06 Civ. 3663(PKC)(DFE)
  ABDULBASIR ABURASHAN],                 (This is not an ECF case)
                    Plaintiff,
                                         REPORT AND RECOMMENDATION
        -against-                        TO JUDGE CASTEL

FORMER SUPERINTENDENT W. PHILLIPS,
et al.,
                    Defendants.
----------------------------------------x
```

DOUGLAS F. EATON, United States Magistrate Judge.

    1. In a Memorandum and Order filed July 25, 2008, Judge Castel wrote:

> Defendants' primary argument is that Sease has not exhausted his administrative remedies. For the reasons discussed herein, I conclude that further factual findings are required to determine whether administrative remedies were available to Sease, ....
>
> DOCS has a well-established, three-step, administrative procedure for inmate grievances called the Inmate Grievance Program ("IGP"). ....
>
>     \*   \*   \*
>
> ... [A]bsent the necessary intermediate appeal to the Superintendent, Sease cannot be said to have exhausted all available administrative remedies. The exhaustion inquiry does not end there, however.
>
> The Second Circuit has recognized that "while the PLRA's exhaustion requirement is 'mandatory,' *Porter,* 534 U.S. at 524, ... certain caveats apply." *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir. 2004). In *Hemphill* [*v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)], the Second Circuit fashioned "a three-part inquiry ... appropriate in cases where a prisoner plaintiff plausibly seeks to counter defendants' contention that the prisoner has failed to exhaust available administrative remedies as required by the PLRA." The court must ask:

>    [1] whether administrative remedies were
>    in fact "available" to the prisoner ...
>    [2] whether the defendants may have forfeited
>    the affirmative defense of non-exhaustion by
>    failing to raise or preserve it, or whether
>    the defendants' own actions inhibiting the
>    inmate's exhaustion of remedies may estop
>    one or more of the defendants from raising
>    the plaintiff's failure to exhaust as a
>    defense ... [and][3] whether special
>    circumstances ... justify the prisoner's
>    failure to comply with administrative
>    procedural requirements.
>
> *Id.* (internal quotation marks and citations omitted).
> "The test for deciding whether the ordinary grievance
> procedures were available must be an objective one:
> that is, would a similarly situated individual of
> ordinary firmness have deemed them available." *Id.* at
> 688 (internal quotation marks and citation omitted).
>
>     Sease contends that he was "barred from enacting
> the first step in the [IGP] process" and that he is
> therefore entitled to an "exhaustion exclusion."
> (Pl.Opp.Br.4.) (alteration, internal quotation marks
> and citation omitted).  Sease asserts that he was a
> "transient inmate" at Sullivan (Pl.Opp.Br.5), and
> that there were not sufficient procedures in place
> for such inmates to address grievances with the IGP.
> ....
>
>     Defendants have not produced any evidence to
> sustain their burden of proving that administrative
> remedies were in fact available to Sease.  The fact
> that Sease made some effort to pursue administrative
> remedies does not mean that such remedies were in fact
> "available" to him.  Thus, I conclude that there is a
> material issue of fact concerning whether or not
> administrative remedies were "available" to Sease. ....

*Sease v. Phillips*, 2008 WL 2901966, *3, 5-6 (S.D.N.Y. July 25, 2008).

     2.  Judge Castel subsequently requested me to hold the evidentiary hearing.  By Order of Reference dated and filed October 9, 2008, he asked me to "hear and report on the issue of exhaustion of administrative remedies."

3.  In a Memorandum and Order dated December 4, 2008, I announced that I would hold the evidentiary hearing on January 12, 2009, and that plaintiff and any other witnesses would appear by video.  I wrote:  "On the present record, I would like to hear testimony from Superintendent Walsh and from plaintiff.  If any party wants to propose an additional witness, then that party should send to me as soon as possible (with a copy to the other side) the witness's name and address and a brief statement of the anticipated testimony."

4.  By letter dated December 8, 2008, plaintiff listed two additional witnesses.  The first was inmate James Baxton, and I arranged to have him available by video.  The second was inmate Abdulkaryim Ibn Brodie; plaintiff wrote that Brodie "will testify to hisself being the only possessor of the weapon [that] defendants have alleged I possessed."  In a Memorandum and Order dated December 23, 2008, I wrote:  "[S]uch testimony does not concern the issue of whether plaintiff exhausted his administrative remedies, and therefore I decline to have Inmate Ibn Brodie participate in the January 12, 2009 hearing."

5.  By letter dated December 17, 2008, AAG Harkins listed additional witness Terry Hauck and explained:  "Mr. Hauck will be able to testify about the procedures that were in place at Sullivan in 2004 regarding the steps to be taken when an inmate who was being transferred from one facility to another wanted to file a grievance originating from the first facility."

6.  My January 12, 2009 hearing generated a 72-page transcript; I am enclosing a copy for plaintiff, and a copy for Judge Castel.

7.  At Tr. 4, Mr. Baxton asked "for some confidentiality."  At Tr. 5, he said:  "The door's ajar and these officers are listening ....  I was threatened by somebody about ... testifying for Mr. Sease ...."  At Tr. 7, I said to Mr. Sease:  "Well I understand he [Mr. Baxton] has a concern and I hope it doesn't blossom into an actual problem.  If it does, I imagine that he may be bringing his own lawsuit in the Northern District of New York ....  The officers at Mr. Baxton's institution know that he is testifying for an inmate.  There is no way to scrub that out of their mind.  So I'm not going to order that the door be closed."  Still at Tr. 7, Mr. Baxton said:  "... I want to testify for him but I will not testify for him if my life is continued to be in danger."  At Tr. 8, Mr. Sease said:  "At this time for the purpose of preserving Mr. Baxton's safety, ... I would like to excuse him from this hearing.  His testimony is not necessary."  Accordingly, I excused Mr. Baxton and did not hear

any testimony from him.

    8.   Plaintiff Sease testified at Tr. 10-29 and at Tr. 61-66. James J. Walsh, who was and still is the Superintendent of Sullivan Correctional Facility, testified at Tr. 31-48.  Terry Houck, who was the Inmate Grievance Supervisor at Sullivan Correctional Facility from 1991 to 2008, testified at Tr. 49-61 and Tr. 66-70.  I found the testimony of Mr. Walsh and Mr. Houck to be entirely credible.

    9.   Mr. Houck was particularly qualified to answer the first question posed by Judge Castel:  In December 2004, after Mr. Sease had been moved from Green Haven to Sullivan, where he was a "transient inmate" soon to be moved farther upstate, **were administrative remedies in fact "available" to Mr. Sease** to address complaints by him that he had been assaulted by officers at Green Haven?  I find that **the answer is "yes."**  At Tr. 51-52 and 54-55, Mr. Houck testified:

> If it's an issue similar to what Mr. Sease is talking about, I would imagine that it would have been a code 49.
>
>     *   *   *
>
> That investigation ... would go to the facility where that occurred - - I believe it was Green Haven - - and it would come back.  And the inmate, Mr. Sease, would have been interviewed at Sullivan Correctional Facility by security staff here.
>
> So the investigation from Green Haven plus the interview of the grievance [grievant] here would comprise the investigation which would be forwarded to the superintendent for his decision at the superintendent's level, and the grievant would [then] have the opportunity to file the complaint to the CORC.  [At Tr. 58, during cross-examination by Mr. Sease, Mr. Houck testified that "the superintendent of this facility [Sullivan] would have given you a decision."]
>
>     *   *   *
>
> Q.  But when an inmate is said to be in transit, are they still able to file a grievance?  Do you know that?

-4-

   A.   Absolutely.  They are allowed to file a grievance.

   Q.   Does an inmate - -

   A.   They're allowed to file a grievance - -

   Q.   Mr. Houck, does an inmate who is said to be in transit, when they wish to file a grievance, do they have to do anything special or unique as compared to an inmate not in transit who wishes to file a grievance?

   A.   No.  They just have to file the grievance on a 2131 form or a piece of paper, a piece of plain paper, submit it to the grievance program in some fashion, ....

10.  Mr. Houck further testified, at Tr. 51 and 53:

    ... [O]nce I receive a grievance, whatever method I receive it by, and it's given a log number by the grievance clerk's log, I make copies of that grievance and forward it for investigations, ....

             *   *   *

    At Sullivan, all the years that I worked here we used a written, handwritten logbook.

   Q.   And are you aware, Mr. Houck, if Sullivan has any recorded log of receiving a grievance from Inmate Sease on or around December 15, 2004?

   A.   From what I understand, there is no grievance from that time.  I [now] work at Eastern [Correctional Facility].  I haven't ... come here and looked in these books.  But I've been told by the staff here that there is no grievance from it. ....

   Q.   But to be clear for the Court, there was staff at Sullivan that performed a search of these logs?

   A.   Yes.

>    11.   I now proceed to consider the second and third questions set forth in *Hemphill* and quoted by Judge Castel:

>> [2] whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense ... [and] [3] whether special circumstances ... justify the prisoner's failure to comply with administrative procedural requirements.

**I find that the answers to both questions are "no."**  My reasons are as follows.

>    12.   Plaintiff Sease testified as follows at Tr. 10-17 and Tr. 20.  He is "not absolutely positive" when he finished writing his two-page document that begins:

>> To: Inmate Grievance Office / Sullivan Corr. Fac.
>> From: John Sease 97A4459-SHU 258
>> Date: Dec. 15, 2004
>> Formal Complaint against officers of Green Haven Corr. Fac.
>> Incident date: Dec. 12, 2004

He believes that he wrote that grievance on the night of December 14 and gave it to a correction officer on December 15.  (Tr. 12.) His original intention was to ask the officer to deliver it to the Inmate Grievance Office, but Mr. Baxton (who was in a neighboring cell in the Special Housing Unit) advised Mr. Sease to "send it directly to the superintendent."  (Tr. 11.)  So Mr. Sease put the document in an envelope addressed to Superintendent Walsh, and handed it to a correction officer.  (Tr. 11-12.) Three or four days later, Mr. Sease repeated that procedure with a second grievance which complained that Sullivan Corr. Fac. was denying him showers and mail.  (Tr. 15.)  Some time later, he had his one and only conversation with Superintendent Walsh.  (Tr. 17.)  Mr. Sease testified:  "I know he [Walsh] said he received some correspondence from me. .... And he basically told me: [']Listen, you're not an inmate at my facility.  There's really not much I can do for you.[']  However, he's going to address the matters ... pertaining to the second grievance [which complained about officers at Sullivan]"  (Tr. 15-17.)  The Sullivan mistreatment did stop; Mr. Sease was then able to get his showers and his mail.  (Tr. 17.)

13.  I do not believe that Mr. Walsh received any written grievances by Mr. Sease.  I also do not believe that Mr. Walsh stated, in words or substance, that he could not do anything about a complaint against Green Haven officers.  Mr. Walsh testified that, if Mr. Sease had told him that he wanted to make such a complaint, then he would have told Mr. Sease to file a grievance with Sullivan's grievance office.  (Tr. 37-38.)  (He did not recall any conversation with Mr. Sease, but he regularly visited the inmates in the Sullivan SHU.)  He also testified that his office received no grievances from Mr. Sease between December 13, 2004 and January 5, 2005, the period when Mr. Sease was at Sullivan (Tr. 36) and, if he had received any, he would have forwarded them to the grievance office (Tr. 35).  I accept Mr. Walsh's testimony; I was favorably impressed with his credibility and his professional attitude.

14.  As mentioned earlier, the log of Sullivan's grievance office does not show any grievance from Mr. Sease.  I pointed out at Tr. 69:  "[T]he grievance which allegedly was handed in by Mr. Sease talked about an incident on December 12 at Green Haven.  The interesting fact is that that precise incident was the subject of a two-day hearing at Sullivan on December 17 and 18, the Tier III hearing" in which the hearing officer essentially found that Mr. Sease had been the aggressor rather than the Green Haven officers.  I asked Mr. Houck:  "Even though that Tier III hearing may have been completed by the time the grievance allegedly came to the superintendent's office, would it still be referred to Green Haven for an investigation ...?"  (Tr. 69.)  Mr. Houck answered "Yes" and Mr. Sease chimed in "That's normal."  (Tr. 70.)

15.  I am unsure whether Mr. Sease actually wrote the grievance in December 2004.  Even if he did, I find that the most logical inference is that he decided not to file the grievance at Sullivan, because he believed that the investigation would reach the same findings already reached in his Tier III disciplinary hearing.  Later, Mr. Sease decided that he wanted to bring this lawsuit; on September 5, 2005, he wrote to the Central Office Review Committee in Albany ("CORC") and said he had filed the grievance at Sullivan.  I acknowledge the possibility that Mr. Sease actually wrote the grievance in December 2004 and kept a copy.  If so, then I acknowledge the possibility that, nine months later, he honestly forgot that he had never filed it at Sullivan.  However, this would not constitute "special circumstances" that might "justify the prisoner's failure to comply with administrative procedural requirements."  *Hemphill*, 380 F.3d at 686.

16.  Mr. Sease's letter to CORC was answered by the following letter dated September 23, 2005 from Thomas G. Eagen, Albany's Director of the entire Inmate Grievance Program (with my emphasis in bold type):

> This is to acknowledge receipt of your correspondence dated September 5, 2005 regarding your grievance.
>
> Contact with the facility administration indicated that no grievances were received from you at Sullivan CF regarding an incident at Green Haven CF.  You are advised to contact the IGP Supervisor at your **current** facility [Clinton CF] with your mitigating circumstances for not filing you grievance within the time frames stipulated by Directive #4040.  If it is determined that the mitigating circumstances presented are not sufficient to file the grievance, you can address **that** determination by filing a grievance.
>
> ....  The Directive makes no provision for an inmate to refer grievances directly to Central Office.

17.  It is undisputed that Mr. Sease did not contact the ICP Supervisor at Clinton CF.  Instead, on January 27, 2006, he signed the Complaint against four Green Haven officers and mailed it to our Court.  At my hearing, at Tr. 26-29, I read the above letter to Mr. Sease, who had his copy in front of him.  I shall now quote from Tr. 28-29:

> THE COURT:  ....  So, didn't you understand that what Mr. Eagen was saying to you was that Sullivan says they never got any grievance at all?  You understood that part, right?
>
> MR. SEASE:  Yes.
>
> THE COURT:  And then he was saying that you were advised to contact the IGP supervisor at Clinton where you are now?  You understood that?
>
> MR. SEASE:  Yes.
>
> THE COURT:  And in the fourth sentence he was saying to you that if that doesn't work, if it's determined that the circumstances are not sufficient

>    to file a new grievance at Clinton, then you can
>    address that determination by filing yet another
>    grievance, filing a grievance with Clinton [and]
>    objecting if they refuse to accept a grievance
>    at Clinton?
>        Wasn't that what you were told to do?
>
>        MR. SEASE:  It is clear now.
>
>        THE COURT:  Well I guess my next question is
>    why did you take the attitude that you were unable
>    to follow the directions of Mr. Eagen?
>
>        MR. SEASE:  I would have to say that I felt
>    that my initial grievance was - - I felt that he
>    should have accepted my initial grievance that I
>    refiled with him.  I feel that would be sufficient
>    enough.
>
>                *   *   *
>
>        THE COURT:  I understand what you're saying but
>    let me direct your attention to the last sentence of
>    Director Eagen's letter which says, "The [D]irective
>    makes no provision for an inmate to refer grievances
>    directly to [C]entral [O]ffice."
>        So, didn't you understand that he was telling you
>    that this didn't count, that you were sending a letter
>    and an enclosure to the [C]entral [O]ffice.  That was
>    not the correct procedure.  Didn't you understand that
>    he was telling you that?
>
>        MR. SEASE:  At the time, no.

18.   As Judge Castel noted, "The test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available."  2008 WL 2901966, at *5, quoting *Hemphill*, 380 F.3d at 688 (with internal quotation marks and citation omitted).  I find that such an individual, receiving Mr. Eagen's letter from the Central Office, would have understood that sending a letter directly to the Central Office was insufficient, and that the grievance procedures remained available but required filing a new grievance at Clinton.  I find that there were no special circumstances that would justify Mr. Sease's failure to comply with the requirements spelled out in Mr. Eagen's letter.

**CONCLUSION AND RECOMMENDATION**

    For the reasons set forth above, I report as follows in connection with Mr. Sease's claims against Green Haven officers for their alleged conduct on December 12, 2004. I find that administrative remedies were in fact "available" to Mr. Sease in December 2004 and continuously up to 2006 when he filed this lawsuit. I find that no acts or omissions should estop any of the defendants from raising Mr. Sease's failure to exhaust those remedies. I find that there were no special circumstances that would justify Mr. Sease's failure to exhaust those remedies. I recommend that Judge Castel review the enclosed transcript and adopt the above findings.

    Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy (i.e., **no later than April 7, 2009**), by mailing written objections to the Pro Se Clerk of the U.S. District Court and mailing copies (a) to the opposing party, (b) to the Honorable P. Kevin Castel, U.S.D.J., at Room 2260, 500 Pearl Street, New York, NY 10007 and (c) to me at Room 1360, 500 Pearl Street, New York, NY 10007. Failure to file objections within 10 business days will preclude appellate review. *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. Rules 72, 6(a), and 6(e). Any request for an extension of time must be addressed to Judge Castel.

                                      */s/ Douglas F. Eaton*
                                DOUGLAS F. EATON
                                United States Magistrate Judge
                                500 Pearl Street, Room 1360
                                New York, NY 10007

Dated:    New York, New York
              March 19, 2009

Copies of this Report and Recommendation are being mailed to:

```
John Sease
(now known as Abdulbasir Aburashan)
(#97-A-4459)
Southport Correctional Facility
P.O. Box 2000
Pine City, NY 14871-2000
      (enclosing the 1/12/09 hearing transcript, 72 pages)

Kevin Harkins, Esq.
Assistant Attorney General
Litigation Bureau
120 Broadway
New York, NY 10271-0332

Pro Se Office
Room 230
U.S. Courthouse
500 Pearl Street
New York, NY 10007

Hon. P. Kevin Castel
      (enclosing the 1/12/09 hearing transcript, 72 pages)
```